1
2
3
4
5
6
7                          UNITED STATES  DISTRICT COURT
8                          NORTHERN DISTRICT OF CALIFORNIA
9
10   ANTIA LELAIND,
11              Plaintiff,                    No. C 06-05870 MHP
            v.
12                                            **MEMORANDUM & ORDER**
     CITY AND COUNTY OF SAN
13   FRANCISCO, PUBLIC UTILITIES              **Re: Defendants' Motion for Summary**
     COMMISSION; DAN GILMAN, in his           **Judgment**
14   individual and official capacities; CHRIS
     LOGIA, in his individual and official
15   capacities; HERB DANG, in his individual
     and official capacities; and DOES 1
16   THROUGH 50,
17              Defendants.
     _____/
18
19
20        Plaintiff Antia Lelaind ("Lelaind") brings this action against defendants the City and County
21   of San Francisco ("City"), the Public Utilities Commission of the City and County of San Francisco
     ("PUC"), and three individuals employed by the PUC in supervisory and management
22
     capacities—Dan Gilman ("Gilman"), Chris Logia ("Logia"), and Herb Dang ("Dang").  She asserts
23
     nine causes of action under federal and state law for unlawful employment practices based on her
24
     race, color, national origin, gender, and age.  Each defendant now moves for summary judgment as
25
     to each and every cause of action.  Having considered the submissions of the parties and for the
26
     reasons stated below, the court enters this memorandum and order.
27
28

1    BACKGROUND[1]

2        Plaintiff Antia Lelaind is a 59-year-old African-American woman of Choctaw and Chicasaw

3    ancestry.  Lelaind Dec. ¶ 2.  She is presently employed as a Senior Stationary Engineer in the

4    Wastewater Enterprises Division of the City and County of San Francisco Public Utilities

5    Commission.  Id. ¶ 1.  Lelaind began her employment with the City PUC in 1985 and achieved the

6    rank of Senior Stationary Engineer in 1993.  Id. ¶¶ 5, 32.  The PUC operates three waste water

7    treatment plants.  Dang Dec. ¶ 2.  Lelaind was assigned to the Oceanside Plant at her request in June

8    2000.  ¶ 40.  She was later reassigned in July 2005 to the Southeast Plant.  Id. ¶ 87.

9        The Wastewater Enterprises Division is managed by the Maintenance Manager ("Manager")

10   who oversees a staff of approximately 150 employees, and in descending order of rank, includes the

11   Superintendent of Maintenance ("Superintendent"), Chief Stationary Engineers ("Chief"), Senior

12   Stationary Engineers ("Senior"), Stationary Engineers, and other lower ranked employees and crew

13   members.  Dang Dec. ¶ 2.  Defendant Herb Dang replaced Kevin Lyons as Manager in August 2004.

14   Id.; Lyons Dec. ¶ 1.  Defendant Dan Gilman was the Superintendent from 2001 until he retired in

15   July 2007.  Gilman Dec. ¶ 1.  At the Oceanside Plant, the Chief and Lelaind's immediate supervisor,

16   was Ronald Chen.  Id. ¶ 10.  When Ronald Chen left City employment in 2004, he was replaced by

17   defendant Chris Logia.  Id.  As Chief of the Oceanside Plant, Ronald Chen, followed by Chris Logia,

18   supervised two maintenance crews, one headed by Senior (and plaintiff) Antia Lelaind and the other

19   headed by Senior Tom Cotter.  Logia Dec. ¶ 2.

20       As Superintendent, Dan Gilman had the discretion to select an Acting Chief to serve on a

21   temporary basis when the Chief was absent for reasons such as illness or vacation.  Gilman Dec. ¶

22   10.  Lelaind had served as Acting Chief from time to time, with Gilman's approval.  Id.  In July

23   2001, while serving as Acting Chief at the Oceanside Plant, Lelaind appointed Carmi Johnson, an

24   African-American female Stationary Engineer, as Acting Senior to fill the position Lelaind normally

25   held.  Lelaind Dec. ¶ 41.  Bob Ward, a white male crew member, engaged in physically and verbally

26   threatening behavior when Carmi Johnson gave him instructions to complete an assignment.  Id.  He

27   lunged his whole body toward her and shouted in a loud voice, "I will do the f— job!"  Id.  Carmi

28   Johnson reported the incident to Lelaind and both women issued a written reprimand.  Id. ¶ 43.  Bob

1    Ward had been a member of Lelaind's crew since 2000 and Lelaind had never seen him or known

2    him to engage in threatening conduct with male superiors or co-workers.  Id. ¶ 42.

3         In July 2001, one month after Lelaind and Johnson reprimanded Bob Ward for his behavior,

4    a hangman's noose was found in Lelaind's work area which she shared with Carmi Johnson.  Id. ¶

5    44.  Lelaind took pictures of the noose and the noose was also observed by Ernie Valenzuela, one of

6    Lelaind's crew members.  Id.; Valenzuela Dec. ¶ 14.  The hanging noose caused Lelaind to have

7    flashbacks of lynchings that occurred during her childhood in Mississippi and for several months

8    afterwards, she had recurring nightmares.  Lelaind Dec. ¶ 45.  Lelaind reported the incident up the

9    chain of command to Superintendent Dan Gilman.  Id.

10        In September 2001, on the day Carmi Johnson returned to work from medical leave, she and

11   Ernie Valenzuela found another noose in their work area, in the same location as the noose hung in

12   July 2001.  Id. ¶ 46.  In July 2002, a third noose was found on the back of Johnson's cart.  Id. ¶ 51.

13   Lelaind personally observed the noose in September 2001 and heard reports of the noose in July

14   2002.  Id. ¶¶ 46, 51.  Lelaind was shaken by the subsequent incidents, just as she had been by the

15   first.  Id. ¶¶ 47, 51.  Between 2001 and 2002, after the first noose appeared, Lelaind heard from

16   coworkers that nooses were found at other locations.  Id. ¶ 55.  And during 2003 or 2004, she

17   learned that there was racist graffiti at yet another location.  Id. ¶ 56.  It said "Porch Monkey" which

18   is a racial slur.  Id.

19        Carmi Johnson filed a discrimination charge with the Equal Employment Opportunity

20   Commission ("EEOC") as well as a civil lawsuit.  Id. ¶¶ 52–53.  Superintendent Gilman pressured

21   Lelaind to write up a negative statement against Carmi Johnson to be used in the City's response to

22   the EEOC charge, but Lelaind refused.  Id. ¶ 52.  Lelaind also gave deposition testimony in

23   connection with Carmi Johnson's lawsuit.  Id. ¶ 53.  Lelaind was subpoenaed for her testimony in

24   December 2002 and was served in a public area of the Oceanside Plant where she worked.  Lelaind

25   Supp. Dec. ¶¶ 3–4.  At the same time and place Lelaind was served, her Chief, Roland Chen was

26   also served.  Id.  Several weeks after Lelaind testified at her deposition, Kevin Lyons, who was

27

28

3

1   Manager at the time, threatened Lelaind with being "AWOL" if Lelaind did not return to work, even

2   though family leave have already been approved for Lelaind to care for her mother.  Lelaind Dec. ¶

3   54.

4       During early 2004, Lelaind supported a demonstration in which African-American female

5   PUC employees marched against racism in the PUC on the steps of San Francisco City Hall.  Id. ¶

6   62.  Additionally, in February of 2004 Lelaind attended a meeting that then PUC General Manager

7   Pat Martel convened to discuss Martel's concerns about gender and race discrimination in the PUC.

8   Id. ¶ 63.  Martel was the only PUC officer present.  She asked each person attending the meeting to

9   tell their story and Lelaind told hers.  Id.

10      When Chief Ronald Chen stepped down permanently in early 2004 as Chief of the Oceanside

11  Plant, Superintendent Gilman had discretion to appoint an Acting Chief until a permanent Chief

12  could be located.  Gilman Dec. ¶ 10.  Gilman appointed Lelaind as Co-Acting Chief together with

13  Jose Cerdana.  Id.  Eventually, however, Gilman decided that a single Acting Chief was needed.  Id.

14  Lelaind made known her desire to take the position.  Lelaind Dec. ¶ 61.  Gilman ultimately

15  appointed Walter Tan, an Asian-American man who was a Senior Stationary Engineer at another

16  plant.  Id.

17      After the appointment of Walter Tan as Acting Chief, Lelaind met again with Pat Martel.

18  Martel told Lelaind that she heard Lelaind had refused the job, and she asked Lelaind for her

19  reasons.  Id. ¶ 64.  Lelaind informed Martel that she never turned the job down, but instead Gilman,

20  knowing that she wanted it, denied her the job and hired Tan.  Id. ¶ 65.  Walter Tan served as Acting

21  Chief until late 2004 or early 2005 when defendant Chris Logia was reassigned from another plant to

22  become the permanent Chief at the Oceanside Plant.  Gilman Dec. ¶ 10.  Chris Logia is a male

23  Filipino.  Lelaind Dec. ¶ 69.

24      On Logia's first day as Chief of the Oceanside Plant, in January 2005, he told Lelaind, "You

25  are having problems," and "You don't know how to handle your crew."  Id. ¶ 70.  He announced that

26  he had decided to remove Randy Winn from her crew because "you can't handle" him.  Id. ¶ 71.

27  Logia also criticized Lelaind for mishandling a crew member's request for a disability

28  accommodation and for giving incorrect instructions to one of her crew members.  Id. ¶¶ 72, 77–79.

4

1    Moreover, from the time he became Chief and for the next few months thereafter, Logia bypassed

2    Leliand and undermined her authority on a number of occasions by rescheduling members of her

3    crew without giving her notice.  <u>Id.</u> ¶¶ 73–74.  Also on a number of occasions, Logia unilaterally

4    removed persons from her crew and reassigned them to the crew led by Tom Cotter, the other Senior

5    Stationary Engineer at the Oceanside Plant.  <u>Id.</u> ¶¶ 75–76.  During regular work meetings with

6    Leliand's male counterpart Tom Cotter, Logia would routinely exclude her.  <u>Id.</u> ¶ 80.  When Logia's

7    predecessor Ronald Chen was Chief, Leliand was routinely included in staff meetings Chen held

8    jointly with Leliand and Cotter where they would discuss plant news, work and projects.  <u>Id.</u> ¶ 81.

9         In June 2005, Logia prepared an annual performance evaluation for Leliand covering the

10   period July 2004 through June 2005.  <u>Id.</u> ¶ 82; Logia Dec., Exh. B.  But for one evaluation in the

11   early 1990s, all of Leliand's previous employment evaluations had rated her as having met or

12   exceeded standards.  Leliand Dec. ¶ 83.  Logia prepared Leliand's evaluation on a standard form and

13   in every category, Logia rated Leliand as having "met objective[s]."  On a scale of 1 through 9,

14   Logia rated Leliand's overall performance a 5, meaning that she met expectations.  Logia also

15   provided written comments.  He made several positive comments regarding Leliand's performance.

16   For example, Logia noted that Leliand had substantial knowledge of a stationary engineer's skills,

17   had good computer skills, worked effectively with others, avoided mis-communication problems,

18   and  maintained harmony with her co-workers.  He also recognized that Leliand had been one of the

19   employees who helped the Oceanside Plant receive the national "2004 EPA Plant of the Year

20   Award."  Logia Dec., Exh. B at 874–875.  Logia also made several negative comments regarding

21   Leliand's performance.  For example, Logia noted the number of days Leliand had been absent ("she

22   was off for 207.9 days and/or 57.0% out of 365 days of" the year).  He also noted that Leliand had

23   problems managing major jobs in a timely manner, she had quality assurance problems, her crew's

24   safety record did not meet standards, and she was unable to complete certain tasks without the

25   assistance of other supervisors.  <u>Id.</u>

26        Leliand refused to sign the evaluation and requested that her union representative write a

27   letter to Manager Herb Dang challenging and rebutting the evaluation.  Leliand Dec. ¶ 85.  Union

28   representative Stephanie Allan wrote a letter to Herb Dang requesting that Logia make certain

changes on the evaluation.  Dang Dec., Exh. A.  Dang reviewed Logia's evaluation and discussed it with Logia and Gilman (note that Logia reported to Superintendent Gilman, and Gilman reported to Manager Dang).  Dang Dec. ¶ 10.  Dang directed Logia to prepare a revised evaluation in which some of the negative references were removed.  Id.  Dang directed Logia to remove the reference to the number of hours Lelaind had worked because Lelaind's absences were authorized and should not have been construed as performance criticism.  Id.  He also directed Logia to remove a reference to two safety incidents because they occurred outside the time period covered by the evaluation.  Other negative references were not removed because Dang believed Logia's overall evaluation was positive, Logia did not downgrade Lelaind's performance ratings, and relevant documentation supported Logia's statements.  Id.  The revised evaluation was forwarded to union representative Stephanie Allan, but no further action occurred because by that time, Lelaind was on a medical leave of absence and was unable to participate in the process.  Id. ¶ 11.

Shortly after Logia prepared the initial performance review in June 2005, Lelaind was reassigned from the Oceanside Plant where she performed field maintenance work to the Southeast Plant where she was assigned to a safety and training position.  Lelaind Dec. ¶ 87.  At the Oceanside Plant, Lelaind's maintenance position was filled by Chuck Copeland, a white male who had recently been promoted to the rank of Senior Stationary Engineer and had been working in the planning unit at the Southeast Plant.  Gilman Dec. ¶ 5.  Lelaind's reassignment to the safety position at the Southeast Plant was effective July 12, 2005, and the first written notice she received of the reassignment was an email from Dan Gilman dated four days earlier on July 8.  Gilman Dec., Exh. A.  Her reassignment was a lateral move that did not change her pay, benefits, or job classification as a "7373 Senior Stationary Engineer."  Gilman Dec. ¶ 5.

Lelaind's reassignment was proposed by Gilman and authorized by Dang.  Dang Dec. ¶ 8.  At around the same time of Lelaind's reassignment, three other experienced Senior Stationary Engineers were also reassigned to different positions.  Id. ¶ 9.  Some were also replaced by less experienced individuals who had just recently been promoted to the Senior rank.  Id.  Leonard Vaynshteyn, who had been supervising a maintenance crew at the Southeast Plant, was transferred to the planning unit.  Id.  He was replaced by Phil Poske, a recently promoted Senior.  Id.  Steve Jones,

1    who had been supervising a maintenance crew at the Northpoint Plant was transferred to the

2    operations unit.  Id.  He was replaced by Jerry Murphy, a recently promoted Senior.  Finally, Doug

3    Scoville was reassigned from a maintenance crew to the planning staff, and subsequently from

4    planning to the facilities unit.  Id.  All three experienced Seniors who were reassigned—Vaynshetyn,

5    Jones, and Scoville—are white men.  Id.

6            At her new safety and training position at the Southeast Plant, Leland was given a

7    makeshift office area in a trailer and for a period of time, she was locked out in the mornings

8    because she was not given a key.  Leland Dec. ¶¶ 88–89.  On a daily basis for five weeks, Leland

9    was given no work to do, despite her constant requests.  Id. ¶ 90.  She was also locked out of her

10   computer for a period of time and was unable to record her hours.  Id.  On August 16, 2005, a

11   meeting between the union and Manager Dang was scheduled to address Leland's concerns about

12   having no office, no work, and no computer access.  Id. ¶ 97.  However, Dang cancelled the meeting.

13   Id.  For Leland, this was the "final straw."  Id.  She went home that day with a headache and began

14   a two-year medical disability leave that did not end until mid-September 2007 when she returned to

15   work.  Id. ¶¶ 97–98.            Leland filed an EEOC charge on February 8, 2006.  DeBellis Dec.,

16   Exh. B.  She filed the complaint in the instant action on September 22, 2006.  Leland's complaint

17   alleges nine causes of action for unlawful employment practices under federal and state law.  Each

18   cause of action is asserted against all defendants—the City, the Public Utilities Commission, and

19   three individual supervisors, Gilman, Logia and Dang.  The nine causes of action are: (1)

20   discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Govt.

21   Code §§ 12900 *et seq.*; (2) retaliation in violation of FEHA; (3) discrimination in violation of Title

22   VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; (4) retaliation in

23   violation of Title VII; (5) aiding and abetting retaliation and unlawful discrimination in violation of

24   FEHA; (6) discrimination in violation of the California Constitution, Article I, Section 8; (7)

25   discrimination and retaliation in violation of 42 U.S.C. section 1983 and the Equal Protection Clause

26   of the Fourteenth Amendment; (8) discrimination and retaliation in violation 42 U.S.C. section 1981;

27   and (9) wrongful demotion under California common law.  Plaintiff's discrimination claims are

28   based on race, color, national origin, gender, and age.

7

1

2 LEGAL STANDARD

3        Summary judgment is proper when the pleadings, discovery, and affidavits show that there

4 is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a

5 matter of law." Fed. R. Civ. P. 56(c).  Material facts are those which may affect the outcome of

6 the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material

7 fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the

8 nonmoving party.  Id.  The party moving for summary judgment bears the burden of identifying

9 those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine

10 issue of material fact.  Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986).  On an issue for which

11 the opposing party will have the burden of proof at trial, the moving party need only point out

12 "that there is an absence of evidence to support the nonmoving party's case."  Id.

13        Once the moving party meets its initial burden, the nonmoving party must go beyond the

14 pleadings, and by its own affidavits or discovery, "set forth specific facts showing that there is a

15 genuine issue for trial." Fed. R. Civ. P. 56(e).  Mere allegations or denials do not defeat a moving

16 party's allegations.  Id.; Gassaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994).

17 The court may not make credibility determinations, and inferences to be drawn from the facts must

18 be viewed in the light most favorable to the party opposing the motion.  Masson v. New Yorker

19 Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.  The moving party may "move

20 with or without supporting affidavits for a summary judgment in the party's favor upon all or any

21 part thereof." Fed. R. Civ. P. 56(a).  "Supporting and opposing affidavits shall be made on

22 personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show

23 affirmatively that the affiant is competent to testify to the matters stated therein."  Fed. R. Civ. P.

24 56(e).

25

26 DISCUSSION

27        At the outset, several portions of plaintiff's expansively pled complaint can be dismissed.

28 First, each defendant moves for summary judgment as to plaintiff's fifth, sixth and ninth causes of

8

1    action for, respectively, aiding and abetting retaliation and unlawful discrimination in violation of

2    FEHA, discrimination in violation of Article I, Section 8 of the California Constitution, and

3    common law wrongful demotion.  Plaintiff does not oppose these portions of defendants' motion

4    and accordingly, summary judgment in favor of all defendants with respect to the fifth, sixth and

5    ninth causes of action is **GRANTED**.

6          Second, defendant City moves for summary judgment as to plaintiff's seventh and eighth

7    causes of action under 42 U.S.C. sections 1983 and 1981.  A municipality cannot be held

8    vicariously liable under section 1983 for the acts of its employees.  Monell v. Department of

9    Social Services of City of New York, 436 U.S. 658, 691 (1978).  Under Monell, a municipality

10   may be liable only if the alleged constitutional violation was committed pursuant to an official

11   policy, custom or practice.  See Gillette v. Delmore, 979 F.2d 1342, 1346–47 (9th Cir. 1992).  The

12   same policy or custom limitation applies to municipal liability under section 1981.  See Federation

13   of African American Contractors v. Oakland, 96 F.3d 1204, 1214–15 (9th Cir. 1996) (section 1981

14   contains an implied cause of action against state actors, but does not impose respondeat superior

15   liability).  Plaintiff has not offered any evidence that the challenged acts in this case were

16   performed pursuant to a policy, custom or practice, or that an official with policy-making authority

17   was in any way involved with the challenged acts.  The City's motion for summary judgment is

18   **GRANTED** insofar as the seventh and eighth causes of action allege municipal liability under 42

19   U.S.C. sections 1981 and 1983.

20         Third, with respect to the individual defendants—Gilman, Logia and Dang—they may be

21   individually liable under sections 1983 and 1981,[2] but no individual liability attaches under Title

22   VII.  Miller v. Maxwell's Int'l, 991 F.2d 583, 587–88 (9th Cir. 1993) (employees and supervisors

23   may be sued under Title VII in their official, but not individual capacities).  Similarly, under

24   FEHA, no individual liability attaches for claims of discrimination, Reno v. Baird, 18 Cal. 4th 640

25   (1998), or retaliation, Jones v. Lodge at Torrey Pines P'ship, 42 Cal. 4th 1158 (2008).  The

26   summary judgment motions of Gilman, Logia, and Dang are **GRANTED** insofar as the first

27   through fourth causes of action for discrimination and retaliation under Title VII and FEHA allege

28   individual liability.

1    Fourth, a city department such as the Public Utilities Commission may be sued only if it

2    has the capacity to sue or be sued under the city charter.  <u>Talbot v. City of Pasadena</u>, 28 Cal. App.

3    2d 271, 274 (1938).  The PUC has no capacity to sue or be sued under the San Francisco Charter.

4    <u>See</u> SF Charter §§ 1.101, 8B.121.  Accordingly, the PUC is not a proper defendant and is

5    **DISMISSED**.

6    Finally, only race is actionable under 42 U.S.C. section 1981 ("[a]ll persons . . . shall have

7    the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens").  Moreover,

8    although age is actionable under FEHA, it is not actionable under Title VII.  <u>Compare</u> Cal. Govt.

9    Code § 12940(a) (making it unlawful to discriminate in employment based on "race, religious

10   creed, color, national origin, ancestry, physical disability, mental disability, medical condition,

11   marital status, sex, *age*, or sexual orientation") (emphasis added), <u>with</u> 42 U.S.C. § 2000e-2(a)

12   (making it unlawful to discriminate in employment based on "race, color, religion, sex, or national

13   origin").  Accordingly, defendants' motion for summary judgment as to the third and fourth causes

14   of action under Title VII for age discrimination is **GRANTED**, as is defendants' motion as to the

15   eighth cause of action under section 1981 for national origin, gender and age discrimination.

16   Whether age is actionable under 42 U.S.C. section 1983 remains an open question in the

17   Ninth Circuit.  <u>See</u> <u>Marr v. Anderson</u>, CV 06-00354, 2007 WL 2363116, at *3 (D. Nev. Aug. 15,

18   2007) (Hicks, J.) (noting that Ninth Circuit has not addressed the issue, but that Fourth, Fifth, and

19   Tenth Circuits have held that age is not actionable under section 1983 because Age Discrimination

20   in Employment Act ("ADEA") provides comprehensive and exclusive remedy).  Because the

21   parties have not briefed the issue and because the present summary judgment motion does not turn

22   on the issue, the court need not decide today whether age is actionable under 42 U.S.C. section

23   1983.  It suffices that age is actionable under at least one of plaintiff's alternative theories, namely

24   under FEHA.

25   Plaintiff's remaining claims are as follows.  Against the City, plaintiff has claims for

26   discrimination and retaliation under FEHA and Title VII.  Her discrimination claims are based

27   upon race, color, national origin, and gender, and additionally, she may assert a claim for age

28   discrimination under FEHA.  Against the individual defendants Gilman, Logia, and Dang, plaintiff

10

1   has claims for discrimination and retaliation under 42 U.S.C. sections 1983 and 1981.  Her

2   discrimination claim under 1983 is based upon race, color, national origin, and gender, but the

3   1981 claim may be based upon race only.  Under the label of "discrimination" plaintiff asserts

4   several theories of unlawful conduct including disparate treatment, hostile work environment and

5   under FEHA, failure to prevent discrimination and harassment, Cal. Govt. Code section 12940(k).

6          Defendants' motions for summary judgment with respect to plaintiff's remaining claims are

7   discussed below.  The court first addresses threshold issues concerning administrative exhaustion,

8   statute of limitations, and continuing violations before turning to the merits of the claims for (1)

9   hostile work environment, (2) disparate treatment, (3) retaliation, and (4) failure to prevent

10  discrimination and harassment.  Plaintiff has also moved for a continuance under Federal Rule of

11  Civil Procedure Rule 56(f), which the court discusses below.

12

13  I.      Administrative Exhaustion

14         Under both Title VII and FEHA, exhaustion of administrative remedies is a prerequisite to

15  resort to the courts.  Lyons v. England, 307 F.3d 1092, 1103–04 (9th Cir. 2002); Okoli v.

16  Lockheed Technical Operations Co., 36 Cal. App. 4th 1607, 1613 (1995).  Under Title VII, a

17  plaintiff must file a complaint before the Equal Employment Opportunity Commission ("EEOC")

18  and under FEHA, a plaintiff must file a complaint before the Department of Fair Employment and

19  Housing ("DFEH").  The scope of the administrative charge defines the scope of the subsequent

20  civil action, and unlawful conduct not included in an administrative complaint is not considered by

21  a court unless the conduct is like or reasonably related to the allegations in the administrative

22  complaint, or can reasonably be expected to grow out of an administrative investigation.  Lyons,

23  307 F.3d at 1104; Okoli, 36 Cal. App. 4th at 1614–17.

24         In contrast to Title VII and FEHA, neither 42 U.S.C. section 1981 nor 42 U.S.C. section

25  1983 require administrative exhaustion.  See 42 U.S.C. §§ 1981, 1983; Metoyer v. Chassman

26  504 F.3d 919, 947 n.11 (9th Cir. 2007) (administrative exhaustion not required under 42 U.S.C.

27  section 1981); Patsy v. Board of Regents, 457 U.S. 496, 516 (1982) (administrative exhaustion not

28  required under 42 U.S.C. section 1983).

1    Lelaind filed her administrative charge on February 8, 2006.  The same complaint was

2    submitted for purposes of Title VII and FEHA exhaustion.  Lelaind alleged in the charge that she

3    believed she had been discriminated against on the basis of her race (Black), gender (female), and

4    age (57).  Lelaind also alleged in the administrative charge that from January 2005 to July 8, 2005,

5    defendant Logia "frequently remove[d] employees from [her] crew" and "frequently wrote false

6    reports about [her]."  She further alleged in the charge that she complained to defendant Dang that

7    Logia had been "treating [her] differently than the other . . . employees who . . . [were] all non-

8    Black males."  Subsequently, she was transferred to a new location and from July 8, 2005 to

9    August 16, 2005, she was "subjected to different . . . conditions of employment in that [she] was

10   not given an office or any work."  DeBellis Dec., Exh. B.  Ultimately, as Lelaind alleged in the

11   charge, she began a stress leave which continued through the time of the filing of the charge.

12       Although the administrative charge does not invoke magic words such as "hostile work

13   environment," "retaliation," or "disparate treatment," the court concludes that each of these claims

14   was administratively exhausted for purposes of Title VII and FEHA.  A hostile work environment

15   claim is composed of a series of separate but related acts that collectively constitute one unlawful

16   employment practice.  National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002).

17   Retaliation occurs when a plaintiff engages in protected activity and suffers an adverse

18   employment action as a result.  Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1034–35

19   (9th Cir.2006).  Disparate treatment occurs when a plaintiff is singled out on account of her race or

20   another protected characteristic and is treated less favorably than others similarly situated.  Id. at

21   1028.

22       Lelaind complained of a series of "frequent" and ongoing acts—removing employees from

23   her crew, writing false reports, refusing to give her an office or assign her work—which could

24   constitute one unlawful employment practice under a hostile workplace claim.  Moreover, Lelaind

25   charged that when she complained about differential treatment on account of her race and other

26   protected characteristics, she was reassigned to a different location.  These allegations are

27   sufficient to exhaust a claim for retaliation.  Finally, she states in the administrative charge that she

28   was treated differently from other employees who were non-Black males and was subjected to

1   different terms and conditions of employment.  These allegations are sufficient to exhaust a claim

2   for disparate treatment.

3          Because the factual allegations in the administrative charge are like or reasonably related to

4   claims for hostile work environment, retaliation, and disparate treatment, and such claims could be

5   reasonably expected to grow out of an investigation based on the facts alleged, the court concludes

6   that Lelaind has exhausted her administrative remedies as required under Title VII and FEHA.

7   Defendants' summary judgment motion with respect to the administrative exhaustion issue is

8   **DENIED**.

9

10  II.     Statute of Limitations and Continuing Violations

11         Having determined that as required under Title VII and FEHA, Lelaind exhausted the

12  claims she now asserts in the present civil action, the next issue the court must consider is whether

13  unlawful acts which fall outside the statute of limitations period may be considered.  Under Title

14  VII, a plaintiff must file an EEOC charge within 300 days after the alleged unlawful employment

15  practice occurred.[3]  42 U.S.C. § 2000e-5(e)(1).  Under FEHA, a plaintiff must file a DFEH charge

16  within one year after the unlawful practice occurred.  Cal. Govt. Code § 12960(d).

17         The parties agree that the statute of limitations under 42 U.S.C. section 1983 is two years.

18  See Del Percio v. Thornsley, 877 F.2d 785, 786 (9th Cir.1989) (statute of limitations for section

19  1983 action borrows from state statute of limitations for personal injury actions); Krupnick v.

20  Duke Energy Morro Bay, L.L.C., 115 Cal. App. 4th 1026, 1028 (2004) (California Legislature

21  replaced former California Civil Procedure Code section 340(3) with section 335.1, thereby

22  extending statute of limitations for personal injury actions from one to two years, effective January

23  1, 2003).

24         The parties also agree that the statute of limitations for a hostile work environment claim

25  under 42 U.S.C. section 1981 is four years.  See Jones v. R.R. Donnelly & Sons, Co., 541 U.S.

26  369, 382–383 (2004).  Defendants state that the statute of limitations for section 1981 disparate

27  treatment and retaliation claims is the same as under section 1983, and plaintiff does not dispute

28  this issue.  See Taylor v. Regents of University of California, 993 F.2d 710 (9th Cir. 1993)

13

1  (applying uniform statute of limitations to employment discrimination claims brought under 42

2  U.S.C. sections 1981, 1983 and 1985).  The court therefore, will apply a two-year statute of

3  limitations to plaintiff's section 1981 claims, except that the section 1981 hostile work

4  environment claim is subject to a four-year statute of limitations.

5       Since Lelaind filed her administrative charge on February 8, 2006, the period within the

6  statute of limitations begins on April 15, 2005 under Title VII, and begins on February 8, 2005

7  under FEHA.  Lelaind filed the complaint in the instant civil action on September 22, 2006.  Under

8  sections 1983 and 1981, the period within the statute of limitations begins on September 22, 2004.

9  For the hostile work environment claim under section 1981, the statute of limitations begins on

10  September 22, 2002.

11      The "continuing violations doctrine" allows a court, in some instances, to consider alleged

12  unlawful behavior that would otherwise be time-barred.  See e.g., National Railroad Passenger

13  Corp. v. Morgan, 536 U.S. 101, 105 (2002).  Under the U.S. Supreme Court's formulation in

14  Morgan, the continuing violations doctrine is applicable to Title VII claims of hostile work

15  environment, but not to claims of discrimination or retaliation.  Under Title VII, discriminatory or

16  retaliatory acts such as termination, failure to promote, denial of transfer, or refusal to hire are

17  "discrete acts" that start a new clock for filing administrative charges alleging that act.  Id. at

18  113–14.  Such discrete conduct is not actionable unless it occurs within the statutory time period.[4]

19  Id.  In Title VII hostile work environment claims, however, a court may consider the entire scope

20  of unlawful behavior, including behavior outside the statutory time period, provided that all acts

21  which constitute the claim are part of the same unlawful employment practice and at least one act

22  falls within the time period.  Id. at 116–17, 122.  Liability may be assessed and damages may be

23  recovered for the entire scope of the hostile work environment.[5]  Id. at 119.

24      The Supreme Court in Morgan did not discuss at length how a court is to determine

25  whether acts about which an employee complains are part of the "same actionable hostile work

26  environment practice."  Id. at 120.  However, the Supreme Court noted that the Ninth Circuit, from

27  which the Morgan case was appealed, considered whether the pre- and post- limitations incidents

28  were "sufficiently" related—for example, where they "involve[d] the same type of employment

14

1   actions, occurred relatively frequently, and were perpetrated by the same managers"—and were

2   not "isolated, sporadic, or discrete." Id. at 107, 120 (citing Morgan v. National Railroad Passenger

3   Corp., 232 F.3d 1008, 1015–16, 1017 (9th Cir. 2000)).

4        For purposes of state law claims under FEHA, the California Supreme Court has rejected

5   Morgan's distinction between discrimination and retaliation on the one hand, and hostile work

6   environment claims on the other.  Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1057–59

7   (2005).  In Yanowitz, the California Supreme Court held that the continuing violations doctrine

8   may be applicable not only to hostile work environment claims, but also to discrimination and

9   retaliation claims where a plaintiff alleges a continuing course of unlawful conduct.  Id.

10        To establish a "continuing course of conduct" for purposes of FEHA, a plaintiff must show

11   that the employer's actions were "(1) sufficiently similar in kind . . . ; (2) have occurred with

12   reasonable frequency; and (3) have not acquired a degree of permanence."  Id. at 1059 (citing

13   Richards v. CH2M Hill, Inc., 26 Cal. 4th 798, 823 (2001)).  "[P]ermanence properly should be

14   understood to mean that an employer's statements and actions make clear to a reasonable

15   employee that any further efforts at informal conciliation to . . . end harassment will be futile."  Id.

16   at 1059 n.19.

17        In the Ninth Circuit, the continuing violations doctrine applies to claims pursuant to 42

18   U.S.C. sections 1981 and 1983 in the same manner as the doctrine applies to claims pursuant to

19   Title VII—the doctrine is applicable to hostile work environment claims involving related acts that

20   collectively constitute a single unlawful employment practice, but inapplicable to claims for

21   discrete acts of discrimination and retaliation.  See Carpinteria Valley Farms, Ltd. v. County of

22   Santa Barbara, 344 F.3d 822, 829 (9th Cir. 2003) (applying Morgan timeliness standards to section

23   1983 claim challenging municipality's regulation of land development).

24        Having determined the relevant statute of limitations under Title VII, FEHA, section 1981,

25   and section 1983; having identified where the continuing violations doctrine is applicable and

26   where it is not; and having set forth the relevant legal standards for determining when pre- and

27   post-limitations incidents may constitute a single, continuing course of conduct under federal and

28   state law, the court now turns to an examination of each of Lelaind's three types of claims for

15

disparate treatment, retaliation, and hostile work environment.  Because the analysis for disparate treatment and retaliation contains significant overlap, the two claims will be discussed together. Where necessary, distinctions will be noted.  For each type of claim, the court will consider whether plaintiff may rely on alleged behavior that occurred outside the applicable limitations period, and second, based on the behavior that the court may properly consider, the court will then address whether defendants are entitled to summary judgment.

III.    Disparate Treatment and Retaliation

"A person suffers disparate treatment in his employment when he or she is singled out and treated less favorably than others similarly situated on account of race" or another protected characteristic.  Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1028 (9th Cir. 2006).  In order to prevail on a claim of discrimination based on disparate treatment, a plaintiff must first establish a prima facie case that gives rise to an inference of unlawful discrimination.  If the plaintiff succeeds in establishing a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct.  If the defendant provides such a reason, then the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination.  McDonnell Douglas v. Green, 411 U.S. 792, 802–805 (1973); Vasquez v. County of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003).

Although the Supreme Court developed the McDonnell Douglas burden-shifting framework in the context of discrimination claims pursuant to Title VII of the Civil Rights Act of 1964, the framework is equally applicable to claims of discrimination based on disparate treatment pursuant to 42 U.S.C. sections 1981 and 1983.  Mustafa v. Clark County Sch. Dist., 157 F.3d 1169, 1180 n.11 (9th Cir. 1998).  The McDonnell Douglas burden-shifting framework is also applicable to claims of discrimination pursuant to California law under FEHA.  Guz v. Bechtel Nat. Inc., 24 Cal.4th 317, 354 (2000).

A plaintiff establishes a prima facie case of disparate treatment if she shows that (1) she belongs to a protected class; (2) she performed her job satisfactorily; (3) she suffered an adverse employment action; and (4) her employer treated her differently than a similarly situated employee

16

1    who does not belong to the same protected class.  Cornwell, 439 F.3d at 1028 (citing McDonnell

2    Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).  "The requisite degree of proof necessary to

3    establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to

4    the level of a preponderance of the evidence."  Cordova v. State Farm Ins. Co., 124 F.3d 1145,

5    1148 (9th Cir. 1997).

6         Like claims for disparate treatment, claims for retaliation under Title VII, FEHA, section

7    1983 and 1981 are analyzed under the McDonnell Douglas burden-shifting framework.  See e.g.,

8    Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002) (retaliation under Title

9    VII); Yanowitz v. L'Oreal USA, Inc., 26 Cal. 4th 1028, 1042 (2005) (retaliation under FEHA).

10   The prima facie case a plaintiff must establish for a retaliation claim, however, differs from the

11   prima facie case a plaintiff must establish for disparate treatment.  To state a prima facie case for

12   retaliation, plaintiff must establish: (1) she was engaged in protected activity; (2) defendant took

13   an adverse employment action; and (3) a causal connection existed between plaintiff's protected

14   activity and defendant's adverse employment action.  Cornwell, 439 F.3d at 1034–35.

15        In this case, many elements of plaintiff's prima facie case for disparate treatment and

16   retaliation are not in dispute.  With respect to the disparate treatment claim, there is no dispute that

17   Leland is a 59-year-old African-American woman of Choctaw and Chicasaw ancestry and

18   therefore belongs to various protected classes based on her race, gender, national origin and age.

19   There is also no dispute that Leland performed her job satisfactorily.  But for one evaluation in the

20   early 1990s, all of Leland's performance evaluations had rated her as having met or exceeded

21   standards.  Even Logia's performance evaluation in June 2005, while including several less than

22   positive comments, also rated Leland as having met objectives in every category.

23        With respect to the prima facie case for retaliation, there is no dispute that Leland engaged

24   in the following protected activities: (1) giving deposition testimony in December 2002 in

25   connection with a discrimination lawsuit brought by Carmi Johnson against the City; (2)

26   participating in an anti-discrimination protest by African-American female PUC employees on the

27   steps of San Francisco City Hall in early 2004; and (3) complaining about discrimination in a

28   meeting convened by PUC General Manager Pat Martel in February 2004.  These are protected

1   activities because they involved protesting or opposing unlawful employment discrimination.  See

2   Moyo v. Gomez, 40 F.3d 982, 984 (9th Cir. 1994).

3        Under the third prong of plaintiff's prima facie case for disparate treatment and the second

4   prong for plaintiff's prima facie case for retaliation, Leliand alleges the following "adverse

5   employment actions": (1) the threat by Kevin Lyons several weeks after Leliand gave deposition

6   testimony in December 2002 for Carmi Johnson's lawsuit that Leliand would be declared

7   "AWOL" if she did not return to work; (2) the refusal of Dan Gilman in early 2004 to appoint

8   Leliand as Acting Chief in early 2004 when Chief Ronald Chen stepped down; (3) the various

9   actions Chris Logia took against Leliand from early- through mid- 2005 when he was selected as

10  the new Chief to replace Ronald Chen, for example, re-scheduling her crew without her

11  knowledge, undermining her authority, and excluding her from meetings; (4) the negative

12  performance evaluation Chris Logia gave Leliand in June 2005; and (5) her reassignment,

13  proposed by Dan Gilman and authorized by Herb Dang, to the Southeast Plant in July 2005 after

14  which she was given no work, office, or computer access.

15       Before turning to the merits of whether some or all of these acts can be considered "adverse

16  employment actions," the court pauses here to first address issues related to the statute of

17  limitations and the continuing violations doctrine.  As the court has already discussed in the

18  previous section, the continuing violations doctrine is inapplicable to disparate treatment and

19  retaliation claims under Title VII and 42 U.S.C. sections 1981 and 1983.  Only those adverse

20  employment actions that fall within the statute of limitations are actionable.  Accordingly, under

21  Title VII, for which the statute of limitations begins on April 15, 2005, all of the alleged

22  conduct—excluding Lyon's threat in late 2002 or early 2003 to declare Leliand "AWOL,"

23  Gilman's refusal to appoint Leliand as Acting Chief in early 2004, and the subset of Logia's

24  conduct occurring prior to April 15, 2005—is actionable.  Under sections 1981 and 1983, for

25  which the statute of limitations begins on September 22, 2004, all of the alleged

26  conduct—excluding Lyon's threat—is actionable.

27       Some of the conduct that is not actionable under the federal statutes may be actionable

28  under FEHA.  The statute of limitations under FEHA begins on February 8, 2005.  But because the

court concludes that there are genuine issues of disputed fact as to whether conduct in the pre- and post- limitations period constitutes a "continuing violation," most of the alleged unlawful conduct must be presented to the jury not merely as background information, but also for purposes of liability.  The 2004 denial of appointment as Acting Chief is similar in kind to the other alleged adverse employment actions falling within the statute of limitations period.  Gilman both passed over Leland for the Acting Chief position and proposed her reassignment to the Southeast Plant. The subset of Logia's conduct occurring prior to February 2005 is similar in kind to Logia's conduct occurring after February 2005.  Indeed, Leland alleges that the negative treatment she received from Logia began in early 2005 and continued, unchanged and unabated, throughout 2005.  This treatment, Leland alleges, culminated in the June 2005 negative performance evaluation, which occurred just one month before she was transferred to the Southeast Plant. Moreover, Logia's selection as Leland's new Chief stems from the same factual circumstances as Gilman's refusal to appoint Leland as Acting Chief, namely the transition following Ronald Chen's decision to step down as Chief.  The close temporal relationship connecting the pre- and post- limitations period conduct, the frequency of the conduct which was recurring but not so pervasive as to have acquired a degree of permanence, as well as the fact that the conduct was perpetrated by the same two managers, one of whom reported directly to the other, leads the court to conclude that a reasonable jury could find that under FEHA there is a continuing course of unlawful conduct.  Accordingly, all of the alleged conduct beginning in early 2004 when Gilman refused to appoint Leland Acting Chief may be actionable, even though some of the conduct falls outside the statute of limitations.

The remaining allegedly unlawful act that falls outside the statute of limitations is Kevin Lyon's threat in late 2002 or early 2003 that Leland would be declared "AWOL" if she did not return to work, even though family leave had been approved for Leland to care for her mother. Unlike the other alleged conduct, the court concludes as a matter of law that no reasonable jury could find this action to be sufficiently similar or close enough in time to the actions falling within the statute of limitations to be actionable under the continuing violations doctrine.  Lyon's "AWOL" threat occurred in late 2002 or early 2003, nearly one year prior to Gilman's refusal to

19

1    appoint Lelaind as Acting Chief, and nearly two years prior to when Chris Logia replaced Ronald

2    Chen as the new Chief of the Oceanside Plant.  By the time Chris Logia became the new Chief in

3    2005, Kevin Lyons no longer worked for the PUC and had been replaced by Herb Dang as

4    Manager.  Moreover, Lyon's "AWOL" threat arose from a different factual context than the other

5    allegedly wrongful conduct.  While the "AWOL" threat arose from a chain of events beginning in

6    July 2001 when Lelaind chose Carmi Johnson to serve in her stead as Acting Senior, the other

7    allegedly wrongful conduct arose from a chain of events beginning in early 2004 when Ronald

8    Chen decided to step down permanently as Chief.  The court concludes as a matter of law that

9    under FEHA, Kevin Lyon's "AWOL" threat is not actionable because it falls outside the statute of

10   limitations and is not saved by the continuing violations doctrine.

11           Having identified what conduct may be actionable under a continuing violations theory, the

12   court returns to the issue of whether the conduct may constitute "adverse employment actions."

13   For Title VII *discrimination* claims under 42 U.S.C. section 2000e-2(a), an adverse action is one

14   that "materially affect[s] the compensation, terms, conditions, or privileges of the [plaintiff's]

15   employment."  Chuang v. Univ. of Cal. Davis, Bd. of Trustees, 225 F.3d 1115, 1126 (9th Cir.

16   2000).  For Title VII *retaliation* claims under 42 U.S.C. section 2000e-3(a), however, adverse

17   action is defined more broadly and is not limited to workplace-related or employment-related acts

18   and harm.  Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 67 (2006).

19   Rather, adverse action for purposes of a Title VII retaliation claim requires a showing that "a

20   reasonable employee would have found the challenged action materially adverse," meaning "it

21   might well have 'dissuaded a reasonable worker from making or supporting a charge of

22   discrimination.'"  Id. at 68.

23           California courts under the discrimination and retaliation provisions of FEHA—Cal. Govt.

24   Code sections 12490(a) and 12490(h), respectively—have also adopted standards for determining

25   what conduct constitutes an adverse employment action.  Yanowitz v. L'Oreal USA, Inc., 36 Cal.

26   4th 1028 (2005).  In Yanowitz, the California Supreme Court concluded that "the term 'otherwise

27   discriminate' in [the anti-retaliation provision of] section 12940(h) should be interpreted to refer to

28   and encompass the *same* forms of adverse employment activity that is actionable under [the anti-

20

1   discrimination provision of] section 12940(a)." <u>Yanowitz</u>, 36 Cal. 4th at 1050–51 (emphasis

2   added).[6]  The Court cautioned against "an unduly narrow view of the type of adverse employment

3   actions that are forbidden" by section 12490(a).  <u>Id.</u> at 1052.  "Appropriately viewed," section

4   12490(a) protects an employee against unlawful conduct "with respect to not only so-called

5   'ultimate employment actions' such as termination or demotion, but also the entire spectrum of

6   employment actions that are reasonably likely to adversely and materially affect an employee's job

7   performance or opportunity for advancement in his or her career."  <u>Id.</u> at 1053–54.

8          With these federal and state standards in mind, the court concludes that for purposes of

9   both her disparate treatment and retaliation claims, plaintiff has met her prima facie case to show

10  an adverse employment action.  First, Dan Gilman's refusal to appoint Lelaind as Acting Chief in

11  2004 is an adverse employment action because it well-established that a failure to promote is an

12  adverse action that materially affects the terms, conditions or privileges of employment.  <u>See</u>

13  <u>Morgan</u>, 536 U.S. at 114 ("acts such as termination, *failure to promote*, denial of transfer, or

14  refusal to hire . . . are actionable 'unlawful employment practices'") (emphasis added).

15         Second, the various actions Chris Logia took against Lelaind from early- through mid-

16  2005, including criticizing her for "not knowing how to handle her crew," re-scheduling members

17  of her crew, undermining her authority, and shutting her out of work meetings are also adverse

18  employment actions for purposes of plaintiff's prima facie case.  Both the California and U.S.

19  Supreme Courts have cautioned that "mere offensive utterances" or "social slights" are generally

20  trivial and cannot be viewed as serious enough to give rise to an adverse employment action.  <u>See</u>

21  <u>White</u>, 548 U.S. at 69 ("[a] supervisor's refusal to invite an employee to lunch is normally trivial, a

22  nonactionable petty slight"); <u>see also</u> <u>Yanowitz</u>, 36 Cal. 4th at 1054 ("a mere offensive utterance

23  or even a pattern of social slights . . . cannot properly be viewed as materially affecting the terms,

24  conditions, or privileges of employment").  In this case, however, Lelaind experienced more than

25  mere social slights and suffered more than mere "humiliation," "ostracism," and "bruised ego."

26  <u>Yanowitz</u>, 36 Cal. 4th at 1054, n.13 (citing various cases).  A reasonable jury could conclude that

27  Logia's treatment negatively and materially affected Lelaind's authority and effectiveness as a

28  manager as well as her ability to acquire and develop skills to advance up the career ladder.

1     Third, Chris Logia's performance evaluation in June 2005 is also an adverse employment

2  action for purposes of plaintiff's prima facie case.  See Ray v. Henderson, 217 F.3d 1234, 1241

3  (9th Cir. 2000) ("undeserved performance ratings, if proven, would constitute 'adverse

4  employment decision'") (citing Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987)); see also

5  Yanowitz, 36 Cal 4th at 1060 (unwarranted negative performance evaluation and criticism met

6  plaintiff's burden of establishing adverse employment action for purposes of prima facie case).

7  Defendants argue that they are entitled to summary judgment with respect to Chris Logia's

8  evaluation because the evaluation was not negative but rather positive.  This, however, is a

9  disputed issue of material fact for the jury to decide and for which resolution on summary

10  judgment is inappropriate.  Defendants argue further that they are entitled to summary judgment

11  because the evaluation was not final.  They cite to Brooks v. City of San Mateo, 229 F.3d 917,

12  929–30 (9th Cir. 2000), for the proposition that a negative evaluation that is not "final or lasting"

13  is insufficient to create a prima facie case.  But just as the question of whether the evaluation is

14  negative or positive is a disputed issue of fact for the jury to decide, the question of whether the

15  evaluation is final or non-final is also a disputed issue of fact.  A reasonable jury could determine

16  that Chris Logia's evaluation, although it was contested and appealed by Lelaind, had "final" and

17  "lasting" harm on her employment.  Indeed, Lelaind's transfer to the Southeast Plant occurred just

18  one month after the evaluation.  Moreover, Brooks is distinguishable because there, the plaintiff

19  abandoned her job while the appeal of her evaluation was pending, and she *never returned*.  Id. at

20  922.  Here, although Lelaind took a two-year medical leave of absence while the appeal of her

21  evaluation was pending, she eventually returned to her job at the PUC.

22     Fourth and finally, the court finds that Lelaind's reassignment in July 2005 to the Southeast

23  Plant, after which she was given no work, office, or computer access, is also sufficient to

24  constitute an adverse employment action for plaintiff's prima facie case.  That her transfer was a

25  lateral move that did not change her pay, benefits, or job classification as a "7373 Senior

26  Stationary Engineer" does not disturb this conclusion.  See Ray, 217 F.3d at 1241 (lateral transfer

27  to another job of the same pay and status may constitute an adverse employment action) (citing St.

28  John v. Employment Development Dept., 642 F.2d 273, 274 (9th Cir. 1981)).

1    The remaining elements of plaintiff's prima facie case require her to show (1) for her

2    disparate treatment claim, that she was treated differently than a similarly situated employee who

3    does not belong to the same protected class, and (2) for her retaliation claim, a causal connection

4    between her protected activity and the adverse employment actions.  Both elements are met.  With

5    respect to the disparate treatment claim, Gilman refused to appoint Leleind as Acting Chief and

6    selected Walter Tan, an Asian American male, instead.  Logia's treatment of Leleind, including his

7    negative performance evaluation, was not equally directed at other employees such as Tom Cotter,

8    a white male who served alongside Leleind as the other Senior Stationary Engineer at the

9    Oceanside Plant.  Granted, other employees, including employees who were white and male, were

10   transferred and reassigned to other positions at around the same time Leleind was transferred to the

11   Southeast Plant.  Nevertheless, this does not defeat plaintiff's prima facie case.  There is no

12   evidence that any of these other transferees were refused an office, assignments, and computer

13   access.  Moreover, just as favorable treatment of other employees in the protected class does not

14   defeat a plaintiff's prima facie case, Lam v. University of Hawaii, 40 F.3d 1551, 1561 (9th Cir.

15   1994) (in case brought by Asian woman against university alleging both race and sex bias,

16   favorable treatment of other Asian women did not entitle defendant to summary judgment),

17   negative treatment of other employees outside the protected class also does not defeat a plaintiff's

18   prima facie case.

19   With respect to the retaliation claim, "causation sufficient to establish the third element of

20   the prima facie case may be inferred from . . . the proximity in time between the protected action

21   and the allegedly retaliatory employment decision."  Cornwell, 439 F.3d at 1035.  Leleind gave

22   deposition testimony for Carmi Johnson's discrimination lawsuit in December 2002.  While this

23   instance of protected activity occurred over one year before Dan Gilman refused to appoint

24   Leleind Acting Chief in 2004, other instances of protected activity occurred closer in time.

25   Leleind protested against discrimination on the steps of San Francisco City Hall in early 2004 and

26   complained about discrimination in a meeting called by Pat Martel in February 2004.  Gilman's

27   refusal to appoint Leleind Acting Chief, Logia's negative treatment and performance evaluation,

28   and Leleind's eventual transfer to the Southeast Plant all occurred contemporaneous with or

23

1    subsequent to these protected activities.  The sequence of events is sufficient to establish plaintiff's

2    prima facie case.

3            Having determined that plaintiff, by establishing a prima case of disparate treatment and

4    retaliation, has satisfied the first step in the <u>McDonnell Douglas</u> burden-shifting framework, the

5    next step is to consider whether defendants have articulated a legitimate, nondiscriminatory reason

6    for their conduct.  The court concludes that defendants have met this burden.  Gilman attests that

7    he did not select Lelaind as Acting Chief because although he offered it to her, she declined,

8    apparently because accepting the position would have required additional administration tasks.

9    Gilman Dec. ¶ 10.  Chris Logia attests that he removed members from Lelaind's crew because the

10   crew members' work schedules required adjustment.  Because the crew members worked different

11   schedules (some worked four ten-hour days Tuesday through Friday, while some worked five

12   eight-hour days Monday through Friday), crews often were not at full strength, which affected

13   their productivity.  Logia explains that he implemented a uniform work schedule and as a result,

14   some members of Lelaind's crew had to be reassigned.  Logia Dec. ¶ 3.  With respect to his

15   evaluation of Lelaind, Logia attests that his comments on the evaluation reflected his professional

16   judgment of Lelaind's performance based on personal observation and a review of relevant

17   records.  Logia Dec. ¶¶ 5–6.  Finally, Herb Dang has testified that he authorized Lelaind's transfer

18   to the Southeast Plant as part of a larger effort to cross-train recently promoted Senior Stationary

19   Engineers and expose them to new and complementary skills and responsibilities.  Dang Dec. ¶ 5.

20

21           The last step in the <u>McDonnell Douglas</u> burden-shifting framework is to consider whether

22   plaintiff has met her burden to show that the employer's stated nondiscriminatory reasons are

23   pretext.  A plaintiff may show pretext "either directly by persuading the court that a discriminatory

24   reason more likely motivated the employer or indirectly by showing that the employer's proffered

25   explanation is unworthy of credence."  <u>Chuang</u>, 225 F.3d at 1123.  Although a plaintiff may rely

26   on circumstantial evidence to show pretext, such evidence must be both "specific" and

27   "substantial" to create a genuine issue of material fact.  <u>Cornwell</u>, 439 F.3d at 1029.

28           In this case, the court concludes that plaintiff has met her burden to show pretext by

24

1    offering specific and substantial circumstantial evidence which establishes intent to discriminate

2    and retaliate.  Plaintiff testifies that there has never been a female chief in the Maintenance

3    Department in the history of the PUC, and there has never been an African-American female chief

4    in *any* department in the history of the PUC.  Lelaind Dec. ¶ 121.  <u>See</u> <u>McGinest v. GTE Service</u>

5    <u>Corp.</u>, 360 F.3d 1103, 1123–24 (9th Cir. 2004) (absence of black supervisors and managers in the

6    workplace is circumstantial evidence of pretext).  Lelaind argues that all of the alleged conduct

7    including the refusal to appoint her Acting Chief, evaluating her negatively, and transferring her to

8    a different location were all motivated by a desire to prevent her from moving up the career ladder

9    and achieving the rank of Chief.  Moreover, Lelaind argues that Logia's criticism and negative

10   treatment of her commenced on Logia's first day as Chief of the Oceanside Plant, before he had

11   any time to observe her ability and fairly evaluate her performance.

12          In sum, the court **GRANTS IN PART** and **DENIES IN PART** defendants' summary

13   judgment motion with respect to the discrimination and retaliation claims asserted under Title VII,

14   FEHA, and 42 U.S.C. sections 1983 and 1981.  Defendants' motion, although generally denied, is

15   granted insofar as plaintiff's claims are based on conduct that falls outside the statute of limitations

16   and is not part of a continuing course of unlawful conduct, i.e. the threat in late 2002 or early 2003

17   by Kevin Lyons that he would declare Lelaind "AWOL" if she did not return to work.

18

19   IV.    <u>Hostile Work Environment</u>

20          Harassment in the form of a hostile work environment constitutes unlawful discrimination

21   in violation of Title VII, FEHA, and 42 U.S.C. sections 1981 and 1983.  <u>Nichols v. Azteca Rest.</u>

22   <u>Enter., Inc.</u>, 256 F.3d 864, 871 (9th Cir. 2001) (citing <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S.

23   57, 64 (1986)) (Title VII); <u>Lyle v. Warner Bros. Television Prod.</u>, 38 Cal. 4th 264, 279 (2006)

24   (citing <u>Fisher v. San Pedro Peninsula Hospital</u>, 214 Cal. App. 3d 590 (1989)) (FEHA); <u>Manatt v.</u>

25   <u>Bank of Am.</u>, 339 F.3d 792, 797 (9th Cir. 2003) (section 1981); <u>Kelly v. City of Oakland</u>, 198 F.3d

26   779, 781 (9th Cir. 2000) (section 1983).  Although commonly alleged in connection with sex and

27   gender, a hostile work environment claim may also be based on other protected characteristics

28   such as race.  <u>Vasquez v. City of Los Angeles</u>, 349 F.3d 634, 642 (9th Cir. 2003) (considering

1    racially based harassment that created hostile work environment).

2           To prevail on a hostile work environment claim under Title VII, a plaintiff must show (1)

3    that she was subjected to verbal or physical conduct because of a protected characteristic such as

4    sex or race, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or

5    pervasive to alter the conditions of the plaintiff's employment and create an abusive working

6    environment. Nichols, 256 F.3d at 872 n.4. To determine whether conduct was sufficiently severe

7    or pervasive to warrant liability, courts look at all the circumstances including the frequency of the

8    discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

9    offensive utterance; and whether it unreasonably interferes with an employee's work performance.

10   Id. at 872 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). In addition, the working

11   environment must be both objectively hostile, as perceived by a reasonable person, and

12   subjectively hostile, as perceived by the plaintiff herself. Id. at 872–73 (citing Faragher v. City of

13   Boca Raton, 524 U.S. 775, 787 (1998)). Title VII hostile work environment standards are equally

14   applicable to FEHA and 42 U.S.C. sections 1981 and 1983. Lyle, 38 Cal. 4th at 279 (FEHA);

15   Manatt, 339 F.3d at 797 (section 1981); Kelly, 198 F.3d at 784–785 (section 1983).

16          Aside from the conduct that forms the basis of her claims for disparate treatment and

17   retaliation, Leland alleges additional conduct for her hostile work environment claim. This

18   additional conduct includes the noose incidents that occurred between 2001 and 2002 as well as an

19   incident of racist graffiti that occurred during 2003 or 2004.

20          Before turning to the substance of plaintiff's hostile work environment claims, the court

21   first addresses issues concerning the statute of limitations. As the court has already discussed, the

22   continuing violations doctrine is applicable to hostile work environment claims under both Title

23   VII and FEHA. Under those statutes, for which the limitations period begins on April 15, 2005

24   and February 8, 2005, respectively, none of the additional conduct involving the nooses and

25   graffiti is actionable unless the incidents can be considered to be part of the same unlawful

26   employment practice which continued into the time period falling within the statute of limitations.

27          As the court has already alluded to, the allegedly wrongful conduct in this case can be seen

28   as arising from two separate chain of events which bear little relationship to each other. The first

                                                      26

chain of events can be traced to July 2001 when Lelaind was elevated temporarily to Acting Chief and in turn chose Carmi Johnson to serve in her stead as Acting Senior.  Following Lelaind's and Johnson's reprimand of Bob Ward who was physically and verbally threatening towards Johnson, nooses were found in Johnson's work area in July and September of 2001 and later in July 2002. Subsequently, Carmi Johnson filed a discrimination suit against the city.  Lelaind gave deposition testimony for that lawsuit in December 2002, and a few weeks later was threatened by Kevin Lyons for being "AWOL."  Then, one year passed.  In that year, 2003, Lelaind learned about an incident of racist graffiti found at a PUC location in which she did not work and there are no facts in the record to indicate that the graffiti was directed at Lelaind, or was otherwise connected to Bob Ward, Carmi Johnson, or Carmi Johnson's lawsuit.  In early 2004, a second chain of events was put into place by Ronald Chen's decision to step down permanently as Chief of the Oceanside Plant.  Dan Gilman denied Lelaind a promotion to the position of interim Acting Chief, Chris Logia was eventually selected to be the new permanent Chief, Logia criticized her and wrote a negative evaluation, and shortly thereafter, Lelaind was transferred by Gilman and Herb Dang to the Southeast Plant.

These two chain of events are not sufficiently similar such that they can be stitched together into a single, continuing course of unlawful conduct.  The two chain of events were separated in time by a year and punctuated by a single, isolated incident of graffiti.  The two chain of events also involved a distinct group of employees and managers—Carmi Johnson, Bob Ward, and Kevin Lyons on the one hand, and Ronald Chen, Dan Gilman, Herb Dang, and Chris Logia on the other.  Granted, Dan Gilman was Superintendent from 2001 until he retired in July 2007, but this common thread between the two factual circumstances does not afford a sufficient degree of similarity to satisfy the continuing violations doctrine.  Moreover, the character and nature of the unlawful conduct differs between the earlier and later periods.  The earlier period involves overt racial harassment such as the alleged noose incidents.  The later period, in contrast, involves personnel management decisions such as promotions, performance evaluations, and transfer decisions.  Given the totality of the circumstances, the court concludes that no reasonable jury

1   could find that the chain of events beginning in July 2001 is part of the same continuing course of

2   conduct as the chain of events beginning in early 2004.

3          Under Title VII and FEHA, therefore, the only conduct actionable under a continuing

4   violations theory is the same conduct which the court has already discussed above in connection

5   with plaintiff's disparate treatment and retaliation claims, i.e. the failure to promote, the negative

6   criticism and performance evaluation, and the transfer.  This conduct, although sufficient to form a

7   basis for plaintiff's disparate treatment and retaliation claims, is insufficient as a matter of law to

8   form a basis for plaintiff's hostile work environment claim.  This is because the conduct, as

9   perceived by a reasonable person, is not objectively severe, hostile or abusive.  None of the

10  actionable conduct involves the type of actions typical of hostile work environment claims, for

11  example, racial slurs, sexist remarks, racially or sexually derogatory acts, physical threats,

12  touching, or violence.  See e.g., Harris, 510 U.S. at 19–20 (defendant's conduct, including asking

13  female employees to get coins from his front pants pocket and throwing objects on the ground in

14  front of him and asking women to pick them up, could create a hostile work environment).

15         Based on the conduct actionable under Title VII and FEHA, no reasonable jury could find

16  that Leland's "workplace [was] permeated with discriminatory intimidation, ridicule and insult

17  [so] severe or pervasive [as] to alter the conditions of her employment and create an abusive

18  working environment."  Id. at 21.  While plaintiff has come forth with sufficient evidence to show

19  that certain personnel and management decisions may have been made with discriminatory and

20  retaliatory intent, she has not come forth with sufficient evidence to show that her workplace was

21  infected with discriminatory intimidation.

22         Although not actionable under either Title VII or FEHA, the noose incidents and racist

23  graffiti may be actionable under 42 U.S.C. sections 1983 and 1981 because those statutes have

24  longer a statute of limitations.  Even assuming that those incidents are actionable under sections

25  1981 and 1981, however, defendants are again entitled to summary judgment.  This is because

26  plaintiff's section 1983 and 1981 claims are based on individual liability of defendants Gilman,

27  Logia and Dang.  However, the record contains no evidence that these individuals were involved

28

28

1   in the noose and graffiti incidents that occurred prior to 2004.  On this basis, defendants are

2   entitled to summary judgment.

3       In sum, the court **GRANTS**, entirely, defendants' summary judgment motion with respect

4   to the hostile work environment claim asserted under Title VII, FEHA, and 42 U.S.C. sections

5   1983 and 1981.

6

7   V.    Failure to Prevent Discrimination and Harassment under FEHA

8       It is an unlawful employment practice under FEHA "for an employer . . . to fail to take all

9   reasonable steps necessary to prevent discrimination and harassment from occurring" in the

10  workplace.  Cal. Govt. Code § 12490(k).  When a plaintiff seeks to recover damages based on a

11  claim of failure to prevent discrimination or harassment she must show three essential elements: 1)

12  plaintiff was subjected to discrimination, harassment or retaliation; 2) defendant failed to take all

13  reasonable steps to prevent discrimination, harassment or retaliation; and 3) this failure caused

14  plaintiff to suffer injury, damage, loss or harm.  California Civil Jury Instructions (BAJI) 12.11.

15      Defendants are not entitled to summary judgment with respect to plaintiff's section

16  12490(k) FEHA claim.  As already discussed above, Lelaind has come forth with sufficient

17  evidence to overcome summary judgment with respect to her disparate treatment and retaliation

18  claims under FEHA.  Moreover, because genuine issues of material fact remain as to whether

19  defendants took reasonable steps necessary to prevent unlawful conduct, the court **DENIES**

20  defendants' motion as it pertains to the FEHA claim under section 12490(k).

21

22  VI.   Plaintiff's Rule 56(f) Motion

23      Pursuant to Rule 56(f), plaintiff requests a continuance to allow her to complete

24  depositions of various witnesses.  Rule 56(f)(2) states "[i]f a party opposing the motion [for

25  summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential

26  to justify its opposition, the court may order a continuance to enable affidavits to be obtained,

27  depositions to be taken, or other discovery to be undertaken."  The Rule "provides a device for

28

1    litigants to avoid summary judgment when they have not had sufficient time to develop affirmative

2    evidence." <u>United States v. Kitsap Physicians Service</u>, 314 F.3d 995, 1000 (9th Cir. 2002).

3            Plaintiff filed the complaint in this action on September 22, 2006.  An initial case

4    management conference was held on February 12, 2007.  At that initial conference, the court

5    directed the parties to complete mediation by May 31, 2007.  To facilitate mediation, the court

6    authorized the parties to commence discovery consisting of three depositions per side in addition

7    to interrogatories and requests for production.  Following completion of mediation, a further case

8    management conference was held on June 22, 2007 and a case management order was issued.  The

9    case management order allowed each side to take up to ten depositions, excluding experts; set the

10   cut-off date for non-expert discovery at January 15, 2008; and set the cut-off date for hearing

11   dispositive motions at December 17, 2007.  In mid-October, the deadline for hearing dispositive

12   motions was subsequently extended to January 7, 2008.

13           By the time plaintiff filed her Rule 56(f) motion, which was delivered to this court in hard

14   copy format on December 21, 2007, but was not filed on the court's electronic filing system until

15   January 2, 2008, the time period for non-expert discovery was approaching an end after having

16   been open for the previous ten months.  Moreover, the deadline for filing summary judgment

17   motions had been set for six months, and defendants in fact waited until the latest possible day to

18   file the present motion on December 3, 2007.  Defendant's motion could not have come as a

19   surprise to plaintiff and plaintiff has had ample time to conduct discovery to oppose the motion.

20   Plaintiff's Rule 56(f) motion is **DENIED**.

21

22

23

24

25

26

27

28

30

1   CONCLUSION

2          For the reasons stated above, defendants' motion for summary judgment is **DENIED IN**

3   **PART** and **GRANTED IN PART**.  Plaintiff's Rule 56(f) motion for a continuance is **DENIED**.

4

5          **IT IS SO ORDERED.**

6

7   Dated: August 29, 2008

8                                                              _____

9                                                              MARILYN HALL PATEL
                                                               United States District Court Judge
10                                                             Northern District of California

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

31

ENDNOTES

1.      The court initially limited discovery in this case to the period beginning January 1, 2001. The court later extended this period by one year.  The facts on which this motion are based are limited accordingly.  Where facts are in dispute, the court has recounted plaintiff's version.  On a motion for summary judgment, the court may not make credibility determinations, must accept the nonmoving party's evidence as true, and must draw all reasonable inferences in favor of the nonmoving party.

2.      Under sections 1983 and 1981, individual liability is subject to a defense of qualified immunity.  None of the individual defendants have moved for summary judgment based on this defense.

3.      The 300 day limitation, not the 180 day limitation applies because Leleind "initially instituted proceedings with a State or local agency with authority to grant or seek relief from [an unlawful employment] practice."  42 U.S.C. § 2000e-5(e)(1).  Here, the same charging document was filed simultaneously with the DFEH and EEOC.

4.      Prior, time-barred acts may not form the basis for liability, but may nevertheless be admissible as background evidence in support of a timely claim.  Morgan, 536 U.S. at 2072.  Whether prior acts are admissible as background evidence is governed by the Federal Rules of Evidence, not by whether the prior acts are "reasonably" or "sufficiently" related.  Lyons v. England, 307 F.3d 1092, 1109–11 (9th Cir. 2002).

5.      Title VII contains provisions that place explicit limitations on some types of relief.  Morgan, 536 U.S. at 119 (citing 42 U.S.C. section 2000e-5(g)(1) which allows for recovery of backpay liability for up to two years prior to the filing of the charge).

6.      The California Supreme Court declined to adopt for FEHA retaliation claims the standard used by the Ninth Circuit for Title VII retaliation cases in Ray v. Henderson, 217 F.3d 1234 (9th Cir. 2000).  Yanowitz, 36 Cal. 4th at 1050, n.8.  There, the Ninth Circuit said that the plaintiff must establish "adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity."  Ray, 217 F.3d at 1242–43.  This Ninth Circuit standard in Ray was later disapproved by the U.S. Supreme Court in White in favor of the now-prevailing standard first articulated by the Seventh and District of Columbia Circuits.  White, 548 U.S. at 60–61, 67–68.

32